IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MILTON SHUMAKE,
      Plaintiff,

vs.                                      Case No. 3:09cv265/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge under the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of the Northern District of Florida pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

      Upon review of the record, this court concludes that the Commissioner's final determination is supported by substantial record evidence and is the result of the application of proper legal principles. The court therefore recommends that the decision of the Commissioner be affirmed.

## I.    PROCEDURAL HISTORY

Plaintiff protectively filed his DIB application on May 12, 2006 (*see* Tr. 119–24, 136).[1]  The application was denied initially (*see* Tr. 94, 96–99), and on reconsideration (*see* Tr. 95, 104–06).  On September 24, 2008, following a hearing, an administrative law judge ("ALJ") rendered a decision in which she found that Plaintiff was not disabled (Tr. 12–32).  The Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 2–6).  Thus the decision of the ALJ stands as the final decision of the Commissioner, now subject to judicial review.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed and is now ripe for consideration.[2]

## II.   FINDINGS OF THE ALJ

In her decision denying Plaintiff's application for DIB, the ALJ made the following findings:

1)    Plaintiff last met the insured status requirements of the Act on December 31, 2006.[3]

2)    Plaintiff did not engage in substantial gainful activity during the period from his amended alleged onset date of July 29, 2006, through his date last insured ("DLI") of December 31, 2006.[4]

3)    Through his DLI, Plaintiff had the following severe impairments:  diabetes mellitus; obesity; coronary artery disease; obstructive sleep apnea; and mild degenerative disc disease of the lumbar spine.

4)    Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

---

[1] All references to "Tr." refer to the transcript and page numbers of the Social Security Administration record filed on September 2, 2009 (Doc. 6).

[2] Plaintiff filed a prior DIB application on August 25, 2003, which was denied at all administrative levels (*see* Tr. 68–85, 89–93), and which he did not appeal judicially.  In this action, Plaintiff does not allege disability during the previously adjudicated period or make a request to re-open the prior determination.  The court therefore need not and does not discuss the August 25, 2003, application in this report and recommendation

[3] To be eligible to receive DIB, a claimant must show he became disabled prior to the expiration of his date last insured.  *See* 20 C.F.R. §§ 404.130, 404.131; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).

[4] Thus the time frame relevant to Plaintiff's claim for DIB is January 29, 2006 (amended alleged onset date), through December 31, 2006 (DLI).

5)   Plaintiff had the residual functional capacity ("RFC") to perform light exertional work, with certain restrictions.[5]

6)   Plaintiff was unable to perform his past relevant work.

7)   Plaintiff was born on July 19, 1956, and on his DLI was fifty years of age, which is defined as an individual closely approaching advanced age.

8)   Plaintiff has a limited education and is able to communicate in English.

9)   Transferability of jobs skills is not material to the determination of disability because the Medical-Vocational Guidelines, used as a framework for decisionmaking, support a finding that Plaintiff was not disabled prior to his DLI, regardless of transferable job skills.

10)  Based on Plaintiff's age, education, work experience, and RFC to perform a limited range of light work, and the testimony of a vocational expert ("VE"), Plaintiff was able to perform the jobs of parking lot attendant, cashier/checker, and sales clerk prior to his DLI.

11)  Plaintiff was not under a disability at any time from July 29, 2006, his alleged onset date, through December 31, 2006, his DLI.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("this Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A

---

[5]  During the period relevant to his instant DIB claim, Plaintiff could perform work that required him to lift and/or carry up to ten pounds frequently and twenty pounds occasionally; sit a total of two hours at a time, up to a total of at least six hours during an eight-hour workday; and continuously stand and/or walk a total of at least six hours during an eight-hour workday.  Plaintiff possessed no manipulative, visual, or communicative limitations although, with respect to postural limitations, Plaintiff was limited to occasional climbing of ramps and stairs and was totally restricted from climbing ladders, ropes, and scaffolds.  He was also limited to occasional balancing, stooping, kneeling, crouching, and crawling, and he needed to avoid concentrated exposure to hazards such as heights and machinery and avoid even moderate exposure to vibrations.

determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.        If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.        If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.        Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[6]

A.        Personal and Employment History

Plaintiff has a tenth grade education (Tr. 38).  According to a disability report dated June 9, 2006, Plaintiff worked as a forklift operator/longshoreman from 1970 to May 2006[7] (Tr. 148–49).  At the August 2008 administrative hearing Plaintiff testified that he is approximately six feet tall and weighs about 390 pounds; according to Plaintiff, in 2006 he weighed over 420 pounds (Tr. 38).

---

[6]  The information in this section is taken from the opinion of ALJ as well as from references to the record made both by Plaintiff and the Commissioner in their memoranda.

[7]  The court notes two minor discrepancies in the record.  Plaintiff stated at the administrative hearing that he last worked in 2004 (Tr. 39); additionally, in the June 9, 2006, disability report Plaintiff indicated he had completed only the ninth grade (Tr. 152).

B.     Relevant Medical History[8]

Plaintiff was treated at the Escambia Community Clinic ("ECC") in Pensacola, Florida, between November 2003 and November 2006 (Tr. 247–85), where his primary care physician was George Smith, M.D.   The "History of Present Illness" section of an ECC treatment note from November 2003 reflects that Plaintiff presented with complaints of fatigue, joint pain, and gastrointestinal symptoms (Tr. 283).   Plaintiff's weigh was 410 pounds (Tr. 284).   In the "Physical Exam" section of the report Dr. Smith noted unremarkable findings, with the exception that Plaintiff had 2+ pitting of the lower left extremity (*id.*).   Dr. Smith's assessment was benign essential hypertension, degenerative joint disease ("DJD"), and constipation; Dr. Smith ordered routine blood tests and prescribed medications for Plaintiff's hypertension and constipation (*id.*).   Dr. Smith next saw Plaintiff in February 2004 for follow-up of hypertension and DJD (Tr. 281–82).   Plaintiff complained of back pain, especially when he was active, which rendered him unable to walk more than one block.   Dr. Smith again assessed Plaintiff with hypertension and DJD; he also decided to screen Plaintiff for diabetes (Tr. 282).   Dr. Smith noted 2+ pitting of Plaintiff's lower left extremity, but he identified no other findings as abnormal in the Physical Exam portion of the report (Tr. 282). In the "Review of Systems" section of the treatment note Dr. Smith reported the presence of joint pain and stiffness (Tr. 281).   In May 2004 Plaintiff presented for follow-up of his hypertension and DJD, and he also complained of pain in the neck, back, and knees (Tr. 279).   Dr. Smith noted in the Physical Exam section of the report that there was some pitting edema but identified no other remarkable findings (Tr. 280); in the Review of Systems section Dr. Smith also noted the presence of joint pain and stiffness (Tr. 279).   He prescribed pain medication for Plaintiff's DJD and other medications for Plaintiff's hypertension and diabetes (Tr. 280).   In July 2004, an osteopathic physician at ECC performed a physical examination of Plaintiff; most of the physical findings were

---

[8]   The administrative record in this case is 662 pages, of which some 450 pages are medical records from numerous health care providers.  Thirty-three pages are the transcript of the administrative hearing.  As discussed below, Plaintiff limits his claims of error to two issues.  In support of his arguments Plaintiff cites a total of only four pages of the medical file and four pages of the hearing transcript.  Given Plaintiff's reliance on such a small portion of the record and his failure to point to other record evidence in support of his appeal, in the outline that follows the court has found it unnecessary to summarize the entire, voluminous medical record.  Rather, the court limits its outline to the evidence that pertains to Plaintiff's arguments, which includes the eight pages cited by Plaintiff in his memoranda, as well as any other references the court has determined are relevant to the resolution of this appeal.

normal, but the osteopath noted painful movements and decreased range of motion of the spine and knees (Tr. 278). Plaintiff was prescribed several medications, including for his DJD (*id.*). In October 2004 the osteopath reported normal findings, including a full range of motion in all joints, and he noted Plaintiff's conditions of obesity, DJD, hypertension, diabetes, and tobacco use disorder. Plaintiff was counseled on weight loss and a sleep study referral was considered (Tr. 275). At a December 2004 visit Plaintiff reported to an ECC staff member that he had suffered a heart attack three weeks prior (Tr. 268). Plaintiff was prescribed medications for hyperlipidemia, coronary atherosclerosis, hypertension, and diabetes (Tr. 270).

Plaintiff returned to Dr. Smith in March 2005. Dr. Smith noted in the Review of Systems section of his report the presence of joint pain and paresthesias (Tr. 266). In the Physical Exam section of the report, Dr. Smith noted some pitting edema in the lower extremities (Tr. 267). Plaintiff's weight was down to 370 pounds (Tr. 266). Dr. Smith listed Plaintiff's diagnoses as diabetes, hypertension, coronary atherosclerosis, tobacco use disorder, unspecified sleep apnea, DJD, and obesity (Tr. 267). During a visit to ECC in June 2005 Plaintiff reported to Dr. Smith that he had experienced numbness in both hands (Tr. 264), and Dr. Smith noted in the Review of Systems section of his report the presence of paresthesias (*id.*). Other than noting some lower extremity pitting, the Physical Exam reflected no remarkable findings (Tr. 264–65). Dr. Smith noted the same diagnoses as had been listed for the prior visit, as well as hyperlipidemia, and he prescribed several medications, including Darvocet for Plaintiff's DJD (Tr. 265). In September 2005 Plaintiff presented to Dr. Smith for follow-up and reported pain and tingling in the right hip and leg (Tr. 261). On physical examination, Dr. Smith noted some pitting in the lower extremities but he identified no other abnormal findings (Tr. 262). The Review of Systems note reflects the presence of joint paint and paresthesias. Dr. Smith ordered some diagnostic tests for Plaintiff's diabetes and atherosclerosis, and he renewed a Darvocet prescription for Plaintiff's DJD (*id.*). Dr. Smith next saw Plaintiff in December 2005 (Tr. 258–59). In the Physical Exam section of his treatment report Dr. Smith noted largely normal physical findings, other than some pitting edema, and he continued or adjusted Plaintiff's medications (Tr. 259).

David E. Phillips, M.D., examined Plaintiff in February 2006 for further assessment of Plaintiff's severe obstructive sleep apnea (Tr. 391–95). Dr. Phillips noted that Plaintiff required the use of a continuous positive airway pressure ("CPAP") machine and advised repeating an overnight oximetry study to ensure Plaintiff's oxygen saturations were well maintained (Tr. 394). Also in February 2006 Plaintiff was given an electrocardiographic stress test, which was stopped early due to Plaintiff's fatigue (Tr. 300). The test summary states that Plaintiff had no chest pain during exercise; other than indicating a low exercise capacity, the test was normal (*id.*). Plaintiff returned to Dr. Smith in March 2006, complaining of difficulty sleeping, increase in blood sugar levels, exertional dyspnea, and calf pain when walking (Tr. 254). The Review of Systems section of the report notes the presence of calf cramps, difficulty breathing on exertion, elevated blood pressure, back pain, polydipsia, and polyuria (Tr. 255). Other than noting some pitting edema, the Physical Exam section apparently reflects nothing remarkable (*id.*). Dr. Smith noted several prescriptions for Plaintiff's diabetes and atherosclerosis, counseled Plaintiff on weight loss and physical activity, and suggested testing to assess Plaintiff's peripheral vascular disease (Tr. 256). As recommended by Dr. Smith, Plaintiff underwent an ankle-brachial index ("ABI") test in March 2006 for his peripheral vascular disease. The test showed moderate stress-induced arterial insufficiency, likely subpopliteal (Tr. 299).

In August 2006, which was shortly after his DLI, Plaintiff returned to Dr. Smith for a routine examination (Tr. 250). Plaintiff was described as "feel[ing] well with no complaints" in the History of Present Illness section of the report (*id.*). In the Review of Systems section of the record Dr. Smith noted the presence of calf and muscle pain (*id.*). Dr. Smith identified Plaintiff's diagnoses as hypertension, well-controlled; peripheral vascular disease (Plaintiff to be referred to a general surgeon for further evaluation); diabetes (Plaintiff to be referred to ophthalmologist); coronary atherosclerosis, sleep apnea; and hyperlipidemia (Tr. 251–52). At 418 pounds Plaintiff was described as morbidly obese; Dr. Smith noted that Plaintiff had a skin condition and some pitting edema of the lower extremity and was "gigantic" in stature, but he made no mention of any other abnormal physical findings in the Physical Exam section of his report (Tr. 251). During a September 20, 2006, examination, a nurse practitioner in the office Dr. Layne Yonehiro, the general surgeon

to whom Dr. Smith referred Plaintiff for his complaints of leg pain, described the results of Plaintiff's March 2006 ABI test as normal (Tr. 385). Other than describing Plaintiff as being morbidly obese, the report of the physical examination notes no remarkable findings (*id.*). Because Plaintiff experienced symptoms of claudication, or muscle pain, with Dr. Yonehiro's knowledge and approval Plaintiff was started on a new medication. Plaintiff was also advised to walk on a daily basis and to work on his diet (*id.*).

Plaintiff saw Michael Kasabian, D.O., in late September 2006 for a disability evaluation (Tr. 396–400). Dr. Kasabian observed that Plaintiff was short of breath after minimal exertion, but he was able to walk slowly without limping or using an assistive device (Tr. 397). No muscle atrophy or asymmetry was noted, and muscle strength was normal. Plaintiff could not perform gross straight leg raising from a supine position, but he could stand on his toes. Plaintiff exhibited tenderness in the lower back area bilaterally, with evidence of paravertebral muscle spasm in that area. Dr. Kasabian's impression was that Plaintiff suffered from diabetes mellitus, hypertension, coronary heart disease, right leg tingling possibly attributable to sciatica or diabetic neuropathy, low back pain, and sleep apnea (Tr. 396–97). Dr. Kasabian conducted a full body range of motion examination and reported that all measurements were normal (Tr. 398–400).

Plaintiff returned to see Dr. Smith on November 14, 2006 (Tr. 247). In the History of Present Illness section of his report, Dr. Smith noted that Plaintiff was feeling "well with no complaints" (*id.*). In the Review of Systems section, Dr. Smith noted Plaintiff's obesity and the presence of chest pain, calf cramps at rest and with activity, difficulty breathing on exertion and while lying down, elevated blood pressure, and swelling of extremities; Dr. Smith also noted that Plaintiff suffered from insomnia, despite the use of a CPAP machine, and from constipation (Tr. 248). On physical examination, Dr. Smith noted no remarkable findings, other than a skin condition, some pitting edema, and a description of Plaintiff's build as gigantic (*id.*). Dr. Smith listed Plaintiff's diagnoses as obesity, diabetes, peripheral vascular disease, insomnia with sleep apnea, constipation, and coronary atherosclerosis (Tr. 249). Dr. Smith recommended physical activity and weight loss, and he prescribed medication for Plaintiff's constipation (*id.*).

Also on November 14, 2006, Dr. Smith completed an RFC assessment of Plaintiff using a form provided by Plaintiff's counsel (Tr. 411–12). Through the use of check marks, Dr. Smith indicated on the form that Plaintiff could stand or walk for one to two hours and sit for four to six hours during an eight-hour workday (Tr. 411). Plaintiff could lift up to fifty pounds frequently and could lift over fifty pounds occasionally (*id.*). He was restricted in climbing stairs or ladders and in the ability to bend and kneel (Tr. 411–12). Plaintiff had no limitations with respect to fine or gross manipulation and no environmental limitations. Dr. Smith opined that Plaintiff required fifteen-minute rest breaks four times per day (Tr. 412). Dr. Smith also noted that Plaintiff suffered from anger and depression and that he experienced no side effects from his medications. In response to a question asking if Plaintiff was "disabled from full-time continuous employment" and another question asking if Plaintiff's "disabling condition [was] expected to last twelve months or longer," Dr. Smith indicated "yes" to each question (*id.*).

The day after his visit with Dr. Smith, Plaintiff experienced chest pain during a treadmill workout (Tr. 414–16). A serial cardiac enzymes test ruled out myocardial infarction, and a treadmill stress echocardiogram revealed no significant areas of ischemia (Tr. 414). On December 11, 2006, or approximately three weeks later, Plaintiff reported to his cardiologist, Dr. Muthusamy Velusamy, that he had suffered no additional episodes of chest pain, was exercising three to five times a week at the gym, walking on the treadmill for thirty minutes, and lifting weights for thirty minutes (Tr. 479). Plaintiff indicated he was "motivated" to lose weight and had "been able to maintain all activities of daily living" (*id.*). Plaintiff reported that he experienced aches in his chest and dizziness after more than fifteen to twenty minutes on the treadmill, but only rarely; he also had right calf pain after about thirty minutes of walking and bilateral lower leg edema (Tr. 480). Also in December 2006, Plaintiff was assessed by Dr. Phillips, the physician who treated his sleep apnea condition (Tr. 390). Dr. Phillips noted that Plaintiff appeared to be doing better and stated that Plaintiff reported he was losing weight, exercising, and using his CPAP device (*id.*).

V.      OPINION OF NON-EXAMINING PHYSICIAN AND HEARING TESTIMONY

    A.      Opinion of Non-examining State Agency Physician

The ALJ considered the RFC assessment completed by non-examining State agency medical consultant Clarence Louis, M.D., on February 7, 2007 (Tr. 452–49). Dr. Louis opined that, prior to his DLI, Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. Plaintiff could stand and/or walk for about six hours in an eight-hour workday. Plaintiff could sit for about six hours in an eight-hour workday. He had an unlimited ability to push and pull hand and foot controls, and no postural limitations, manipulative limitations, visual limitations, or communicative limitations. Dr. Louis also opined that Plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, and hazards.

    B.      Administrative Hearing Testimony

At the administrative hearing held August 21, 2008 (Tr. 33–66), Plaintiff testified that he quit his job as a forklift operator after he started falling asleep at work and having back, leg, and hip pain (Tr. 39–40). He stated that he had tried to find other work but got discouraged because "I can't read good. I can't spell good and stuff, you know, I have to get my children to fill out papers and stuff for me . . . computers is hard for me to . . . try to get a job. And then, like I said, my back and stuff being hurting me I couldn't stand long" (Tr. 40). Plaintiff estimated that he could probably stand a "couple of hours" (*id.*). He further testified that in 2006 he could not walk very far because he would lose his breath and become fatigued, could lift and carry about one pound due to pain in his hands, and could sit for two hours at a time (Tr. 41–42, 50). He stated that his back pain was intermittent and relieved by medications, but that at times he had trouble bending over (Tr. 42, 53). His daily activities included sleeping, watching television, doing a little housework, cooking, and shopping (Tr. 45).

    When asked about his education, Plaintiff testified that

    You know I had a learning disability. . . . And I didn't really notice it until I got in
    ninth grade when kids used to pick, you know, at us. . . .Then it came to bothering
    me, you know, and then, like I say, I can't read that good or spell good and stuff,
    and, like I say, it hurted [phonetic] because other kids were picking and stuff, and,
    like I say, I didn't realize, and, you know, that I was slow until I got to high school.

(Tr. 52–53).

A vocational expert ("VE") also testified at the hearing. In one of the hypothetical questions posed to the VE, the ALJ described a man of Plaintiff's age, education, and past work experience (Tr. 54–55). The individual had the ability to lift and carry up to ten pounds frequently and up to twenty pounds occasionally; to sit continuously for two hours for a total of six hours in an eight-hour workday; and to stand or walk continuously for two hours at a time for a total of six hours in an eight-hour workday. There were no manipulative, visual, or communicative limitations. Posturally, the individual was limited to occasionally climbing ramps and stairs and balancing, stooping, kneeling, crouching, and crawling; he was totally restricted from climbing ladders, ropes, and scaffolds. He needed to avoid concentrated exposure to heights and machinery and avoid even moderate exposure to vibrations. The VE testified that such an individual could not perform Plaintiff's past relevant work as he had performed it but could perform several jobs existing in substantial numbers in the national economy, including parking lot attendant, cashier/checker, and sales clerk (Tr. 56–58).

VI.    DISCUSSION

Seeking remand of this matter for an award of benefits or, alternatively, for further administrative proceedings, Plaintiff raises the following two issues in the instant appeal, listed here in the order in which the court addresses them: (1) the ALJ erred by rejecting the disability opinion of Dr. Smith, his treating physician; and (2) because Plaintiff is illiterate the ALJ should have, but failed to, apply § 202.00(d) of the Medical-Vocational Guidelines to find Plaintiff disabled.

1.    Rejection of Treating Physician's Opinion

The ALJ rejected Dr. Smith's November 14, 2006, disability opinion, including his assessment of Plaintiff's exertional restrictions and need for four, fifteen-minute rest periods daily, on the ground that Dr. Smith's findings and limitations were inconsistent with or unsupported by his office treatment notes during the relevant period. Plaintiff contends this was error. According to Plaintiff, the ALJ failed to fully consider Dr. Smith's treatment notes, which support his disability opinion, and instead choose "to highlight only those opinions supportive of the conclusion she

sought to reach" (Doc. 8 at 8).[9]  The Commissioner responds that the ALJ considered and assigned proper weight to Dr. Smith's opinion that Plaintiff was disabled from full-time, continuous employment.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* <u>Lewis</u>, 125 F.3d at 1439–41; <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991); <u>Sabo v. Chater</u>,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, however, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

Where substantial record evidence supports the ALJ's decision to discount a treating physician's opinion, the opinion of an examining physician itself becomes entitled to significant weight.  *See* <u>Richardson</u>, 402 U.S. at 408 (report of consultative examiner may constitute substantial

---

[9]  Plaintiff also contends that certain references in Dr. Smith's treatment notes are internally inconsistent, inaccurate, and probably were written in error.  Therefore, Plaintiff submits, they were improper for the ALJ to cite in support of her decision.  This contention merits little discussion.

The statements to which Plaintiff refers are Dr. Smith's comments in two of his treatment notes that Plaintiff reported he "was feeling well with no complaints" (Doc. 8 at 9; *see also* Tr. 247, 250).  That Dr. Smith reported these statements does not, as Plaintiff submits, represent an inaccuracy or internal inconsistency in his records necessitating remand.  Despite certain objective physical findings made by Dr. Smith in connection with Plaintiff's chronic conditions, Plaintiff could nevertheless have indicated—and the records reflect that he in fact did indicate—that subjectively, at least to some extent, he felt well with no complaints.  In any event, these brief comments are not a definitive statement of Plaintiff's physical state.  Moreover, Plaintiff presents no evidence whatsoever—only speculation—in support of his contention that the notes "must have been an administrative error" on Dr. Smith's part.  Nor has Plaintiff shown how two such instances, out of numerous other visits to Dr. Smith and other physicians which resulted in hundreds of pages of medical evidence, are significant or sufficient to justify remand.

evidence supportive of a finding adverse to a claimant); 20 C.F.R. § 404.1527 (every medical opinion should be evaluated, and unless a treating source's opinion is given controlling weight, the following factors are considered in deciding the weight to be given to any medical opinion: examining versus non-examining; treatment relationship, including length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship; supportability of the opinion(s); consistency with the record as a whole; specialization; and "other factors").

In this case, as outlined above, all of Dr. Smith's medical records dated prior to Plaintiff's alleged onset date of July 29, 2006 [November 2003 (Tr. 283–84); February 2004 (Tr. 281–82); May 2004 (Tr. 279–80); March 2005 (Tr. 266–67); June 2005 (Tr. 264–65); September 2005 (Tr. 261–62); December 2005 (Tr. 258–59); and March 2006 (Tr. 254–55)], as well as those dated after Plaintiff's alleged onset date but prior to his DLI of December 31, 2006 [August 2006 (Tr. 250–52); and November 2006 (Tr. 247–49)], generally reflect that Plaintiff often reported various physical complaints which Dr. Smith noted and for which he frequently prescribed medications or made other treatment recommendations. Throughout the Physical Exam sections of these records, however, Dr. Smith noted few abnormal or otherwise remarkable objective findings; primarily, he only noted physical findings of pitting edema of the lower extremities and, occasionally, a skin condition or Plaintiff's "gigantic" stature (*id.*). Such findings are not consistent with the limitations Dr. Smith described in his disability assessment. Additionally, in the Review of Systems section of his treatment records, Dr. Smith notes whether—as to the cardiovascular system, the musculoskeletal system, etc.—certain conditions are present or are not present. It is unclear whether in this section Dr. Smith is reporting objective findings, subjective complaints, or a combination of both, although the last alternative seems the most likely. In any event, the findings or complaints that Dr. Smith identified in the Review of Systems sections, such as the presence of joint pain, stiffness, obesity, paresthesias, calf pain, difficulty breathing on exertion, elevated blood pressure, swelling of extremities, back pain, polydipsia, and polyuria, do not reflect intensity, duration, or other indicators of severity. As such, they provide no support for the restrictions imposed by Dr. Smith in his disability assessment. Indeed, the ALJ did not accept Dr. Smith's conclusion that Plaintiff was able to lift up to fifty pounds frequently or more than fifty pounds occasionally and instead limited

Plaintiff to lifting twenty pounds or less or a sustained basis (Tr. 29). The ALJ also rejected Dr. Smith's conclusion in his disability assessment that Plaintiff needed four daily rest periods. The ALJ concluded that not only was this restriction unsupported by Dr. Smith's other records but also that such a severe restriction would be unneeded given the lesser weight restriction assigned of twenty pounds (*id.*).

This court concludes that the ALJ had good cause to discount Dr. Smith's November 2006 disability assessment because, as the ALJ stated and as is apparent from a review of the evidence, this assessment was inconsistent with or unsupported by Dr. Smith's own medical records, to which the ALJ properly gave substantial weight. *See* Phillips, 357 F.3d at 1240-41; *See* Lewis, 125 F.3d at 1439–41. Moreover, contrary to Plaintiff's contention, the record reflects that the ALJ fully considered Dr. Smith's treatment notes and did not fail to review all of the evidence contained therein. *See* Briggs v. Massanari, 248 F.3d 1235, 1239 (10th Cir. 2001) (noting that although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision).

Having properly discounted Dr. Smith's disability opinion, the ALJ was entitled to give significant weight to the records of examining physicians Drs. Yonehiro, Kasabian, Phillips, and Velusamy. *See* Richardson, 402 U.S. at 408. These records, summarized, reflect the following. The September 2006 records from Dr. Yonehiro show that Plaintiff's March 2006 ABI test was normal; additionally, other than a notation that Plaintiff was morbidly obese, his physical examination apparently was unremarkable (Tr. 385). Also in September 2006, Dr. Kasabian reported that while Plaintiff became short of breath with minimal exertion, he was able to walk slowly without limping or using an assistive device and he could stand on his toes (Tr. 397). Muscle strength was normal, with no muscle atrophy or asymmetry. Although there was tenderness and evidence of paravertebral muscle spasm in the lower back, a full body range of motion examination was completely normal (Tr. 398–400). In December 2006, Dr. Phillips noted that Plaintiff appeared to be doing better with his sleep apnea and that Plaintiff reported he was losing weight, exercising, and using his CPAP device (Tr. 390). Dr. Velusamy's December 2006 report—prepared just prior to Plaintiff's DLI—reflects that Plaintiff had suffered no recent episodes of chest pain; exercised three to five

times a week at the gym; walked on the treadmill for thirty minutes at a time, with only some calf pain and only rarely experiencing dizziness or chest pain; and lifted weights for thirty minutes (Tr. 479). Because their records are supported by objective findings and consistent with the medical evidence as a whole, the ALJ was entitled to give "greater" weight to the records of these examining physicians. *See* Richardson, 402 U.S. at 408; 20 C.F.R. § 404.1527. Moreover, based on the medical evidence, including the foregoing records, the ALJ was entitled to give "some" weight to the RFC assessment of the non-examining consultant Dr. Louis, in particular Dr. Louis' assessment of Plaintiff's exertional limitations (Tr. 452–49).

For the foregoing reasons, the court concludes that the ALJ did not err by rejecting the disability opinion of treating physician Dr. Smith and instead giving greater weight to Dr. Smith's treatment records. Nor did the ALJ err by giving greater weight to the views expressed in the records of examining physicians Drs. Yonehiro, Kasabian, Phillips, and Velusamy or some weight to the opinion of the non-examining consultant Dr. Louis.

2.       Application of § 202.00(d) of the Medical-Vocational Guidelines

In addition to finding that Plaintiff retained the RFC to perform a limited range of light work, the ALJ found that Plaintiff had a limited education and was able to communicate in English (Tr. 30). Because Plaintiff lacked the RFC to perform the full range of light work, thus precluding exclusive reliance on Medical-Vocational Rule 202.11 to find him "not disabled," the ALJ elicited the testimony of a VE. Based on the VE's testimony, and using the Medical-Vocational Guidelines as a framework for decision making, the ALJ concluded that jobs existed in the national economy which Plaintiff could have performed prior to his DLI and thus he was not disabled for the relevant time period. Plaintiff contends that in so concluding the ALJ erred. Apparently relying solely on his hearing testimony, Plaintiff submits that "[i]t is uncontroverted that [he] is . . . illiterate and limited to a light residual functional work capacity" (Doc. 8 at 5). Therefore, Plaintiff submits, under § 202.00(d) of the Medical-Vocational Guidelines, the ALJ should have found him "disabled." The Commissioner responds that Plaintiff's argument relies on the inaccurate premise that he is illiterate, a finding which the ALJ properly did not make.

Social Security regulations define illiteracy as "the inability to read or write." 20 C.F.R.

§ 404.1564(b)(1). More specifically, an individual is illiterate within the meaning of the Act if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *Id.* "Generally, an illiterate person has had little or no formal schooling." *Id.* Section 202.00(d), on which Plaintiff relies, provides:

> Where the same factors in paragraph (c) of this section regarding education and work experience are present, but where age, though not advanced, is a factor which significantly limits vocational adaptability (i.e., closely approaching advanced age, 50-54) and an individual's vocational scope is further significantly limited by *illiteracy* or inability to communicate in English, a finding of disabled is warranted.

20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.00(d) (emphasis added).

In this case, Plaintiff testified at the administrative hearing that he could not read or spell well and had a learning disability as a youngster (Tr. 40 52–53). This testimony, even accepted as true, does not satisfy the criteria for establish illiteracy under § 404.1564(b)(1), as it does not reflect Plaintiff's *inability* to write or read. Indeed, in a disability report dated June 9, 2006, Plaintiff reported that he could read and understand English and write more than his name in English (Tr. 147). Also, in a function report dated August 20, 2006, Plaintiff indicated that he could follow written instructions "alright" (Tr. 162). Additionally, Plaintiff reported to a disability determinations worker in December 2006 that, among other activities, he was able to engage in "reading" (Tr. 190). Furthermore, Plaintiff's background reflects that he attended school through at least the ninth grade (Tr. 152); as noted, however, individuals with this amount of formal education usually are not considered to be illiterate. § 404.1564(b)(1). Plaintiff has not pointed to any evidence in the record to support his contention that he is illiterate; in fact, the evidence actually suggests otherwise. Accordingly, there was no error in the ALJ's failure to find that Plaintiff is illiterate within the meaning of § 404.1564(b)(1), and none in her failure to find Plaintiff disabled under § 202.00(d) of the Medical-Vocational Guidelines.

VII.    CONCLUSION

For the foregoing reasons, the court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439;

Foote, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 9th day of July 2010.

s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**